# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

DEMETRIUS ROBINSON and
TAMARA ROBINSON,

    Plaintiffs,

    v.

NATIONSTAR MORTGAGE LLC,

    Defendant.

Civil Action No. TDC-14-3667

## MEMORANDUM OPINION

Plaintiffs Demetrius and Tamara Robinson (the "Robinsons") have resided in a home in Damascus, Maryland that has been subject to a mortgage loan. After attempts to modify the loan failed, the Robinsons filed a class action Complaint against Defendant Nationstar Mortgage, LLC ("Nationstar") for alleged violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601–2617 (2012), specifically RESPA's implementing regulations known as "Regulation X," 12 C.F.R. § 1024.41 (2019), and the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law §§ 13–101 to 13–411 (West 2015). Presently pending is Nationstar's Motion for Summary Judgment, Nationstar's Motion to Strike, and the Robinsons' Motion for Class Certification. The Motions are fully briefed, and no hearing is necessary to resolve the issues. *See* D. Md. Local R. 105.6. For the following reasons, the Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART; the Motion to Strike will be DENIED; and the Motion for Class Certification will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Relevant factual and procedural background is set forth in the Court's prior Memorandum Opinion granting in part and denying in part Nationstar's partial Motion to Dismiss. *See Robinson v. Nationstar Mortg. LLC*, No. 14-3667, 2015 WL 4994491, at \*1–2 (D. Md. Aug. 19, 2015). Additional facts relevant to the pending motions are set forth below.

## I.   Motion for Summary Judgment

The Robinsons own a business called Green Earth Services, which provides waste and recycling services to clients. They have a home in Damascus, Maryland purchased by Demetrius Robinson ("Mr. Robinson"). In 2007, Mr. Robinson obtained a loan with the principal amount of $755,000 to refinance the property. While Mr. Robinson signed the promissory note ("the Note"), the deed of trust ("the Deed"), and the balloon payment rider for the 2007 loan, Tamara Robinson ("Mrs. Robinson") signed only the Deed and balloon payment rider and did not sign the Note. Nationstar ultimately became the servicer of the Robinsons' loan.

After several customers of Green Earth Services canceled its services, the Robinsons sought loss mitigation in the form of a loan modification from Nationstar. Between July 2010 and November 2013, the Robinsons submitted and Nationstar denied three applications for a loan modification under the Home Affordable Modification Program ("HAMP"). The denial letters stated that the loan's principal balance exceeded the limit under HAMP. As to the third denial on November 7, 2013, Nationstar informed the Robinsons that the loan modification application was denied because the mortgage loan was not in default.

During this period, in August 2013, the Robinsons retained a forensic loan auditor, Professional Compliance Examiners ("PaCE"), and paid it $2,275 to help them communicate with

Nationstar. In February 2014, after their income had further decreased, the Robinsons ceased making payments on the mortgage loan. After this missed payment, Nationstar assessed a late fee.

After they became delinquent on their loan, the Robinsons submitted another loan modification application to Nationstar on March 7, 2014. When Nationstar received the application, it prevented late fees from being assessed and put a hold on any foreclosure proceedings. However, Nationstar did not comply with all requirements of Regulation X, which became effective on January 10, 2014. At the time, Nationstar had not completed the process of updating its systems to conform to those requirements. Accordingly, Nationstar did not send the Robinsons an acknowledgment letter within five days stating that it had received the application, as required by Regulation X.

On March 8, 2014, Nationstar sent to Mr. Robinson a letter stating that he was ineligible for a HAMP modification, but on March 15, 2014, it sent a different letter offering a loan modification under which Mr. Robinson would receive a reduced interest rate for two years. In approving such a modification, Nationstar made a mistake: the underwriter working on the Robinsons' loan had erroneously double-counted their income. Before the error was discovered, Mr. Robinson appealed this offer as insufficient on April 10, 2014.

The Robinsons and Nationstar then engaged in a series of tortured exchanges over the next several months. Mrs. Robinson was the primary point of contact for the Robinsons in interacting with Nationstar. Although she has worked as a bookkeeper for various companies, she was not employed between March and September 2014. On May 5, 2014, Nationstar asked the Robinsons for additional information to evaluate the appeal, including documents to verify their income. In response, on May 30, 2014, Mr. Robinson sent Nationstar the exact same application that he had submitted on March 7, 2014. On July 17, 2014, Nationstar informed Mr. Robinson by letter that

he did not qualify for a HAMP modification and that since the March 14 loan modification offer had not been accepted, it was withdrawn.

Mr. Robinson then submitted another loan modification application on August 25, 2014. The next day, Nationstar sent a letter noting that the August 25 application had been received and requesting additional information. On September 9, 2014, Nationstar sent Mr. Robinson a letter denying the loan modification application and stating that it could not offer him any modification because his income was not high enough to cover the mortgage payments under any modification option. During this time and up until September 25, 2017, Nationstar had not begun any foreclosure proceedings on the Robinsons' home. The Robinsons have not made any mortgage payments since January 2014 and have not been assessed any late fees since February 2014. From January 2014 to the present, the Robinsons have not pursued other loss mitigation options, such as a short sale.

The Robinsons assert that they have paid a total of $6,147.12 in unspecified fees to Nationstar. In addition to the fee paid to PaCE, the Robinsons also assert as damages $50.58 in administrative costs, specifically postage fees for sending information relating to their loan modification application to Nationstar, and 120 hours of time expended on the loan modification process. The Robinsons also claim as damages interest overcharges of approximately $141,000.

## II.     Motion for Class Certification

### A.     Procedural History

Before relating the facts relevant to the Motion for Class Certification, the Court will highlight the relevant procedural history affecting the record before the Court. A Scheduling Order was first entered on November 24, 2015, and the period for discovery was extended four times between November 2015 and January 2017. On February 16, 2017, the Court referred the case to

4

United States Magistrate Judge Charles B. Day to address discovery issues. On June 16, 2017, the Magistrate Judge bifurcated discovery to focus initially on the merits of the Robinsons' individual claim and the question of class certification, ordered Nationstar to disclose electronic records so that the Robinsons could sample Nationstar's data for purposes of a motion for class certification, and limited the discovery of such records to a sample of 400 loans from the period from January 10, 2014 to June 30, 2014 and "to areas which inform" the Court's decision on class certification, namely whether Nationstar was in compliance with Regulation X. Mot. Class Certif. Joint Record ("MCC JR") 0907. After two more extensions were granted, based on a finding by the Magistrate Judge that "Defendant has failed to comply" with its discovery obligations and delayed the process, discovery closed on March 22, 2018. Order, ECF No. 125.

Throughout discovery, Nationstar repeatedly stated that it could not produce the data on loss mitigation or loan modification applications from its databases in the form requested by the Robinsons. As a result, on January 29, 2018, the Magistrate Judge granted the Robinsons' Motion to Compel in which the Robinsons had sought to have the Court order Nationstar to accept and run scripts created by the Robinsons' expert to extract the relevant data from Nationstar's databases on the sample of loans from which they could test their methodology for identifying members of the proposed classes. The Robinsons' expert had written the scripts using data dictionaries and without accessing the databases. The Magistrate Judge ordered Nationstar to run those scripts and return the electronic data to the Robinsons. When those scripts did not produce data that allowed the Robinsons to conduct the sampling, the Magistrate Judge ordered Nationstar on April 3, 2018 to run certain "structural scripts" on two of its four databases. Discovery Order, ECF No. 143. The Robinsons appealed the Magistrate Judge's ruling because it did not require Nationstar to run a structural script for a third database. On July 16, 2018, the Court affirmed the Magistrate Judge's

ruling and required Nationstar to produce all outstanding "records subject to discovery orders." Order at 2, ECF No. 164. After an additional period of expert discovery relating to the class certification motion, discovery closed on December 30, 2018.

### B.    Nationstar Tracking Systems

Nationstar employees use four software applications and databases to store and track electronic information relating to loans: (1) Loan Services and Accounting Management System ("LSAMS"), Nationstar's primary loan servicing software, which contains data for loans, including the permanent records of the accounting history, communication logs, and letters documented with codes that were sent to the borrower; (2) Remedy Star, Nationstar's proprietary loss mitigation and loan modification management system, which, among other tasks, tracks the status and timeline of a loan modification and links to documents stored in FileNet; (3) LPS Desktop ("LPS"), an application which Nationstar uses to track and manage foreclosure processes and communicate with outside attorneys; and (4) FileNet, a platform that houses PDF images of documents, including letters sent to borrowers by Nationstar. Every mortgage has a unique loan number that can be used to identify the borrower and the loan in each of the four databases.

At different stages in the processing of a loan modification application, Nationstar employees enter certain codes into certain databases, and certain information can be stored and accessed through those applications. According to Nationstar's Underwriting Workflow Procedures, which sets forth the steps followed to review loans for modifications, when a borrower submits a loan modification application, a code is entered into LSAMS and updates the loan's substatus in Remedy Star. A letter noting receipt of the application is automatically generated and sent to the borrower, and a Nationstar employee checks the application's documentation to determine if it is complete based on a checklist. Whether an application is complete depends on

the requirements of the investor who holds the loan. If the initial application is complete, the substatus in Remedy Star is changed to refer the application to an underwriter for review, and an additional code is added in LSAMS. A code is also added to LSAMS to put a hold on foreclosure proceedings. If the initial application is not complete, a different Remedy Star substatus notation and LSAMS code are entered, and a letter is created and sent to the borrower asking for the required documents. A code is entered in Remedy Star when the letter is sent. These letters are based on standard Nationstar templates, and the code reflects the type of letter sent.

Once an underwriter is assigned, that employee double-checks whether the application contains all required documentation and is complete. If more documents are required, then the same Remedy Star substatus and LSAMS code that denote missing documents are entered. Once the documents are received, the Remedy Star substatus and LSAMS code are changed again to mark the application complete. The loan is then evaluated for loan modification options. If the application is denied, a notice to that effect is sent to the borrower. When each event occurs—either the mailing of a letter or the changing of a code or substatus—the date is recorded in the databases.

## C.    Class Methodology

The Robinsons' designated expert, Geoffrey Oliver, has offered a methodology for identifying class members and when their rights under RESPA and the MCPA have been violated. Oliver is the Chief Executive Officer of Hilltop Advisors LLC, a financial services consulting, compliance audit, and accounting advisory firm, and has extensive experience conducting compliance reviews for mortgage servicers, including for compliance with loss mitigation procedures. He was retained by the Robinsons under an arrangement through which he is to be paid a flat fee of $125,000: $62,500 up front, with an additional $62,500 to be paid if a class is

7

certified in this case. To prepare his expert report, Oliver reviewed a randomly selected sample of 400 loans serviced by Nationstar in which a loan modification application was submitted.

For the claims that rely on the timing of a response, Oliver and the Robinsons propose using changes in the Remedy Star substatus or LSAMS codes and documents stored in FileNet to identify the date a loan modification application was received or marked as complete, to identify the date a response was sent, and to count the number of days between events. According to Oliver, to determine that certain disclosures or specific information were conveyed to borrowers, the "object_id" field used in FileNet can be used to identify the type of letter sent. Furthermore, Oliver states that since Nationstar employees used templates to communicate with borrowers, he could determine whether there were violations of certain RESPA provisions based on entries showing that Nationstar employees used templates that did not comply with RESPA. He asserts that damages to borrowers can be calculated based on entries in LSAMS and other data showing that fees were assessed, and that it would be possible to identify which fees would not have been assessed but for a RESPA violation.

Because of the manner in which class discovery was conducted, *see supra* part II.A, Oliver did not have access to all of Nationstar's data fields for the representative sample of loans. Instead, he analyzed certain data fields that were returned by the scripts written by a different expert. According to Oliver, if he used incorrect data, that was a result of the limited data fields and definitions provided to him. Based on his experience and review of deposition transcripts of Nationstar employees, Oliver asserts that Nationstar has computerized data from which RESPA violations may be identified, not least because Nationstar must be able to demonstrate its compliance with RESPA to regulators.

In contrast, Nationstar maintains that there is no way to reliably identify when a loss mitigation application is submitted or complete using codes and status change entries in its existing software, and that the only way to make those determinations is through a file-by-file review. Specifically, the application itself would have to be reviewed to determine when it was stamped as received by Nationstar. In addition, Nationstar asserts that not all loan modification applications referred to an underwriter are complete. While the Nationstar employee who conducts the initial processing of an application may refer it to an underwriter based on its facial completeness, the underwriter makes the final determination of whether the application is complete and is responsible for obtaining any additional required documentation. Through both a declaration by a Nationstar Vice President of Default Servicing, Brandon Anderson, and an expert report by Stuart D. Gurrea, Nationstar contests Oliver's analysis and endeavors to establish that the only way to identify RESPA violations using Nationstar's data is through a file-by-file review. For example, since default fees are often paid by sources other than the borrower, such as in a short sale or refinancing, Nationstar challenges Oliver's assessment that fees identified through LSAMS can be deemed to constitute damages from RESPA violations, because the software does not reflect who paid the fee.

Furthermore, according to Nationstar, to identify the content of a letter sent to a borrower, the letter itself must be viewed. Nationstar has no process for standardizing file names. The entry under "object_id" acts as a unique identifier for an electronic file, but it does not contain information about the file's substance and could in fact contain multiple submissions or documents relating to one borrower. Moreover, because borrowers often submit multiple loan modification applications, and because Nationstar's data is stored at the loan level, not at the application level, Nationstar claims that it is not possible to tell from the data alone, without reviewing the files,

9

whether a status or code change is in response to a specific loan modification application. Nationstar claims that manual review of each file would take about 60 to 90 minutes per file.

## DISCUSSION

### I.  Motion for Summary Judgment

Nationstar seeks summary judgment on the Robinsons' RESPA claims on the grounds that (1) Mrs. Robinson is not a proper plaintiff because she is not a "borrower" within the meaning of RESPA; (2) RESPA is inapplicable because Nationstar was required to comply with Regulation X only as to the Robinsons' first loss mitigation application; (3) there is no evidence to support a violation of 12 C.F.R. §§ 1024.41(f), (g), and (h); and (4) there is no evidence of actual damages from any RESPA violation. Nationstar also asserts that the Robinsons have not identified evidence sufficient to support their MCPA claims.

#### A.  Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

10

## B.    RESPA

Congress enacted RESPA to protect consumers from "unnecessarily high settlement charges caused by certain abusive practices" in the real estate mortgage industry, and to ensure "that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process." 12 U.S.C. § 2601(a). RESPA's implementing regulations, codified at 12 C.F.R. §§ 1024.1 to 1024.41 and known as "Regulation X," *see* 12 C.F.R. § 1024.1, prescribe additional duties and responsibilities of mortgage servicers under RESPA. Regulation X went into effect on January 10, 2014. Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act ("Regulation X"), 78 Fed. Reg. 10696, 10708 (Feb. 14, 2013) (codified at 12 C.F.R. Part 1024).

Under a provision of Regulation X entitled "Loss mitigation procedures," mortgage servicers must take certain steps when a borrower applies for loss mitigation measures, such as the loan modifications sought in this case. *See* 12 C.F.R. § 1024.41. Specifically, if a loss mitigation application is received "45 days or more before a foreclosure sale," the loan servicer must provide a notice to the borrower "in writing within 5 days" of receiving it in which the servicer acknowledges receipt of the application and states whether the "application is either complete or incomplete." 12 C.F.R. § 1024.41(b)(2)(B). A complete loss mitigation application is "an application in connection with which a servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower." *Id.* § 1024.41(b)(1). If the application is complete "more than 37 days before a foreclosure sale," the servicer may not move for a foreclosure judgment or conduct a foreclosure sale, but instead must first "[e]valuate the borrower for all loss mitigation options available to the borrower," send to the borrower "a notice in writing stating the servicer's determination of which

11

loss mitigation options, if any, it will offer," and include a statement of applicable appeal rights. *Id.* § 1024.41(c)(1)(i)–(ii), (g). That notice must be provided within 30 days of receiving the complete loss mitigation application. *Id* § 1024.41(c)(1). "If a borrower's complete loss mitigation application is denied for any trial or permanent loan modification option available to the borrower," the servicer must state in the required notice to the borrower "the specific reason or reasons for the servicer's determination for each such trial or permanent loan modification and, if applicable, that the borrower was not evaluated on other criteria." *Id.* § 1024.41(d). If the loan servicer denies a loan modification application where the complete application was received more than 90 days before a foreclosure sale, the servicer must allow the borrower to appeal and must respond to the appeal within 30 days of receiving it by stating in writing whether the appeal was granted and a loan modification will be offered. *Id.* § 1024.41(h)(1), (4). Finally, a loan servicer "is only required to comply with the requirements" of section 1024.41 "for a single complete loss mitigation application for a borrower's mortgage loan account." *Id.* § 1024.41(i).

A borrower may enforce violations of these provisions through a private cause of action pursuant to 12 U.S.C. § 2605(f). See 12 C.F.R. § 1024.41(a). A servicer that fails to comply with Regulation X is liable for actual damages and, upon a finding of a "pattern or practice" of non-compliance by the servicer, up to $2,000 in statutory damages. 12 U.S.C. § 2605(f)(1). For a class action brought for violations of Regulation X, a servicer is liable for "actual damages to each of the borrowers in the class" and, upon a finding of a "pattern or practice" of noncompliance, statutory damages amounting to a maximum of $2,000 per class member up to a total of the lesser of $1 million or one percent of the servicer's net worth. *Id.* § 2605(f)(2).

### 1.    Mrs. Robinson

Nationstar argues that summary judgment should be granted against Mrs. Robinson because she is not a "borrower" within the meaning of RESPA. A "borrower" may enforce the provisions of Regulation X pursuant to 12 U.S.C. § 2605(f). 12 C.F.R. § 1024.41(a). That provision provides, in parallel, that a loan servicer which does not comply with Regulation X is liable "to the borrower." 12 U.S.C. § 2605(f). It follows that only borrowers may bring a claim that a loan servicer has violated Regulation X. *See Johnson v. Ocwen Loan Servicing*, 374 F. App'x 868, 873 (11th Cir. 2010) (holding that a plaintiff who "was not a borrower or otherwise obligated on the . . . loan" did not have standing to bring a RESPA claim); *Nelson v. Nationstar Mortg. LLC*, No. 16-0307, 2017 WL 1167230, at *3 (E.D.N.C. Mar. 28, 2017). Courts have held that a person who did not sign the promissory note is not a "borrower" for the purposes of RESPA because that individual has not "assumed the loan." *Nelson*, 2017 WL 1167230, at *3 (collecting cases).

Here, Mrs. Robinson signed the Deed but did not sign the Note. The Deed specifies that a person who signs it but "does not execute the note" is a co-signer of the Deed in order to mortgage and convey that person's interest in the Property under the terms of the Deed, but "is not personally obligated to pay the sums secured by this Security Instrument," and her consent is not required to alter the terms of the Deed or the Note. Mot. Summ. J. Joint Record ("MSJ JR") 0102. Thus, Mrs. Robinson is not "obligated" to pay the amount due on the Note and therefore is not a "borrower" for purposes of RESPA. *Johnson*, 374 F. App'x at 873; *Keen v. Ocwen Loan Servicing, LLC*, No. 17-0982, 2018 WL 4111938, at *5–6 (M.D. Tenn. Aug. 28, 2018) (holding that a spouse who signed a deed of trust stating that a person who did not sign the promissory note was not obligated

on the security instrument, but did not sign the promissory note, was not a borrower under RESPA).

The cases cited by the Robinsons do not alter the Court's conclusion. In *Washington v. Am. Home Loans*, No. 09-08213, 2011 WL 11651320 (C.D. Cal. Nov. 12, 2011), the court held that a plaintiff who signed a deed of trust on a property and was a joint tenant with her son, but did not sign the promissory note, had constitutional standing to bring a RESPA claim because she stood to be injured if a default on her son's loan led to the loss of her equitable interest in the property. *Id.* at *2. The court, however, did not explain how in the absence of any obligation to pay back to the Note, the plaintiff qualified as a "borrower" under the RESPA statute. *Id.* In *Frank v. J.P. Morgan Chase Bank, N.A.*, No. 15-05811, 2016 WL 3055901 (N.D. Cal. May 31, 2016), the plaintiff had signed the deed of trust but not the promissory note but was nevertheless deemed to have standing because she had owned the home with a right of survivorship with her deceased husband, who had signed the note. *Id.* at *5. In *Frank*, due to the state's community property laws, the mortgage was "a community debt," and after her husband died, the plaintiff "was therefore obligated to make the loan payments" because of her interest in the home. *Id.* Here, the Robinsons have not put forward any evidence that Mrs. Robinson has an ownership interest in the home that would specifically obligate her to make payments on the loan. Indeed, Mr. Robinson testified that Mrs. Robinson did not sign the Note because she did not purchase the property with him. Where the deed of trust explicitly states that Mrs. Robinson is not obligated on the loan, the Court finds that she is not a borrower under RESPA and cannot bring the claim against Nationstar under Regulation X. *See Keen*, 2018 WL 4111938, at *5–6. Nationstar's Motion for Summary Judgment will be granted as to Tamara Robinson.

## 2.    Subsequent Loss Mitigation Application

Nationstar argues that it should be granted summary judgment on all of the RESPA claims because Nationstar was required to comply with Regulation X only as to a borrower's first loss mitigation application, and the Robinsons' March 7, 2014 application was not their first loan modification application.

Regulation X, which became effective on January 10, 2014, 78 Fed. Reg. 10696, 10708, provides that "[a] servicer is only required to comply with the requirements of this section for a single complete loss mitigation application for a borrower's mortgage loan account." 12 C.F.R. § 1024.41(i). The regulation is silent on whether a loss mitigation application submitted before January 10, 2014 could qualify as the "single complete loss mitigation application." *See id.*; 78 Fed. Reg. 10696, 10836. While several district courts have concluded that loss mitigation applications submitted before Regulation X's effective date do not count as the single application for which a loan servicer must comply with Regulation X, *see, e.g.*, *Farber v. Brock & Scott, LLC*, No. 16-0117, 2017 WL 4347826, at *15 (D. Md. Sept. 29, 2017); *Billings v. Seterus, Inc.*, 170 F. Supp. 3d 1011, 1015 (W.D. Mich. 2016), at least one district court has held that loan servicers need not comply with Regulation X if the borrower had previously submitted a loss mitigation application before the January 10, 2014 effective date, *see Trionfo v. Bank of America, N.A.*, No. 15-0925, 2015 WL 5165415, at *4 (D. Md. Sept. 2, 2015).

Based on the language of Regulation X, the Court finds that a loss mitigation application submitted before the effective date does not count as the single application subject to the regulation. The language of the regulation states not that a loan servicer must comply with Regulation X's requirements only for a borrower's first loss mitigation application, but that a loan servicer must "comply with the requirements" only "for a single complete loss mitigation

application." 12 C.F.R. § 1024.41(i). The distinction is crucial. Regulation X's effective date reflected "an intent not to apply it to conduct occurring prior to that date." *Campbell v. Nationstar Mortg.*, 611 F. App'x 288, 297-98 (6th Cir. 2015) (holding that Regulation X did not apply to loss mitigation applications submitted before the effective date). Thus, a loan servicer could not have complied with Regulation X for a loss mitigation application submitted before January 10, 2014 because there was no regulation in effect with which to comply. Accordingly, a loan servicer must comply with Regulation X as to the first loss mitigation application submitted after the effective date. *See Farber*, 2017 WL 4347826 at 15; *Billings*, 170 F. Supp. 3d at 1014.

Here, even though the Robinsons' March 7, 2014 loss mitigation application was not the Robinsons' first such application, it was their first submitted after the effective date of Regulation X. Therefore, Nationstar was required to comply with section 1024.41 in processing it. *See* 12 C.F.R. § 1024.41(i). The Court will therefore deny the Motion for Summary Judgment as to this argument.

### 3.    12 C.F.R. § 1024.41(f), (g), (h)

Nationstar further argues that summary judgment must be entered in its favor on the Robinsons' claims under 12 C.F.R. § 1024.41(f), (g), and (h) because there is no evidence in the record that Nationstar violated those provisions. Under subsections (f) and (g), a loan servicer is not permitted to begin foreclosure proceedings or move for foreclosure judgment if "a borrower submits a complete loss mitigation application" except in certain circumstances. *Id.* § 1024.41(f), (g). The record is undisputed that as of September 25, 2017, Nationstar had neither started foreclosure proceedings nor moved for foreclosure judgment on the Robinsons' home. In their memorandum in opposition to the Motion for Summary Judgment ("Opposition"), the Robinsons admit that they "do not have evidence that Nationstar dual tracked them" or began foreclosure

proceedings while a loan modification application was pending. Opp'n Mot. Summ. J. ("Opp'n") 13, ECF No. 222. Summary judgment will therefore be entered for Nationstar on the claims that Nationstar violated subsections (f) and (g).

Under subsection (h), if a loan servicer receives a complete loss mitigation application more than 90 days before a foreclosure sale but then denies the application, the servicer must allow the borrower to appeal and must respond to the appeal within 30 days of receiving it. *Id.* § 1024.41(h)(1), (4). Nationstar sent Mr. Robinson two letters denying his loan modification application on July 17, 2014 and September 9, 2014, but there is no evidence in the record that the Robinsons submitted an appeal to either of those letters. While Demetrius Robinson did appeal Nationstar's March 15, 2014 offer of an in-house modification, the requirements of subsection (h) were not triggered because the offer was not a denial of a loan modification application. *See* 12 C.F.R. § 1024.41(h)(1). The Robinsons do not address this argument in their Opposition. Since there is no genuine issue of material fact as to whether Nationstar violated subsection (h), summary judgment will be entered for Nationstar on that claim.

### 4.   Actual Damages

Finally, Nationstar argues that summary judgment should be entered on the RESPA claims because the Robinsons cannot establish that they have suffered actual damages as a result of Nationstar's violations of Regulation X.

A servicer that fails to comply with Regulation X is liable for "any actual damages to the borrower as a result of the failure" to comply. 12 U.S.C. § 2605(f)(1)(A); *see* 12 C.F.R. § 1024.41(a). Plaintiffs "must present specific evidence to establish a causal link between the [servicer's] violation and their injuries." *McLean v. GMAC Mortg. Corp.* ("*McLean II*"), 398 F. App'x 467, 471 (11th Cir. 2010). Actual damages may include late fees; denial of credit or access

to the full amount of a credit line; out-of-pocket expenses incurred in dealing with a RESPA violation, such as expenses for preparing and copying correspondence; and lost time and inconvenience, including time spent away from employment while preparing correspondence "to the extent it resulted in actual pecuniary loss." *McLean v. GMAC Mortg. Corp.* ("*McLean I*"), 595 F. Supp. 2d 1360, 1366 (S.D. Fla. 2009), *aff'd*, 398 F. App'x 467, 471 (11th Cir. 2010). *But see Sutton v. CitiMortgage, Inc.*, 228 F. Supp. 3d 254, 274–75 (S.D.N.Y. 2017) (holding that "incidental costs related to the sending of correspondence" to the servicer, including "postage and travel," are not actual damages under RESPA because such a rule "would transform virtually all unsatisfactory borrower inquiries into RESPA lawsuits"). Actual damages may also include "non-pecuniary damages, such as emotional distress and pain and suffering." *McLean II*, 398 F. App'x at 471.

Some courts have held that administrative costs that predate the alleged RESPA violation cannot constitute "actual damages." *See, e.g.*, *Linderman v. U.S. Bank Nat'l Ass'n*, 887 F.3d 319, 321 (7th Cir. 2018). Others, however, have concluded that "all expenses, costs, fees, and injuries fairly attributable to" a servicer's RESPA violation are damages, "even if incurred before the" violation, because the "wrongful act . . . cause[d] damages retroactively" and "transmogrifie[d]" the costs that predate the RESPA violation into damages. *Marais v. Chase Home Fin., LLC*, 24 F. Supp. 3d 712, 728 (S.D. Ohio 2014).

In *Baez v. Specialized Loan Servicing, LLC*, 709 F. App'x 979 (11th Cir. 2017), the United States Court of Appeals for the Eleventh Circuit held that postage costs incurred by the plaintiff to send the "initial request for information is not a cost to the borrower 'as a result of the failure' to comply with a RESPA obligation," because a violation has not occurred and will not "necessarily occur" at the time the plaintiff paid the postage. *Id.* at 983. The Court agrees that costs, including

administrative costs, "incurred whether or not the servicer complied with its obligations" are not actual damages "caused by, or 'a result of,'" the RESPA violation, whether or not they occurred before or after the violation. *Id.* at 983 (quoting 12 U.S.C. § 2605(f)(1)(A)). However, if the costs are shown to have been incurred in response to the RESPA violation, the Court finds that they would be actual damages within the meaning of 12 U.S.C. § 2605(f).

Notably, although a borrower may recover up to $2,000 in statutory damages upon a showing of a "pattern or practice of non-compliance with the requirements" of Regulation X, 12 U.S.C. § 2605(f)(1)(B), a borrower cannot recover these additional damages "without first recovering actual damages." *Wirtz v. Specialized Loan Servicing, LLC*, 886 F.3d 713, 719–20 (8th Cir. 2018); *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1247 n.4 (11th Cir. 2016) *(dicta)*. *But see Ayres v. Ocwen Loan Servicing*, LLC, 129 F. Supp. 3d 249, 266 (D. Md. 2015).

The Robinsons assert that they have suffered damages in the lost opportunity to have their mortgage loan modified and to pursue other loss mitigation options; in the fees, late fees, and interest that Nationstar has assessed since they became delinquent on their loan; in the lost "time and effort" which they expended in "pursuing the loss mitigation process with Nationstar" rather than trying to improve their business; and in administrative costs, including "postage, travel expenses, photocopying, scanning, and facsimile expenses." Am. Compl. ¶¶ 89, 90, ECF No. 26-1. They have claimed $141,000 in interest; $6,147.12 in fees assessed by Nationstar; $2,275 in consulting fees; $50.58 in administrative costs; and lost time and labor of approximately 120 hours; as well as punitive and statutory damages. They do not seek damages in the Amended Complaint for emotional distress or include such a claim in their itemized list of damages submitted in discovery.

In support of these claims, Mr. Robinson testified in his deposition that the $141,000 in interest represents the amount that the Robinsons have been overcharged over the life of the loan. He asserted that the amount of fees was calculated based on Nationstar's statements, but he could not specify the nature of the fees. The one-time consulting fee was paid in August 2013 to PaCE, a forensic loan auditor, to advise the Robinsons on how to communicate with Nationstar and to handle their loan. After March 2014, Mrs. Robinson was primarily responsible for communicating with Nationstar and PaCE. While she is trained as a bookkeeper, at the time of the Robinsons' 2014 application for a loan modification and in the subsequent months, Mrs. Robinson was not employed in any capacity.

Some of the alleged damages are not supported in law or in fact. Since Regulation X explicitly does not require a loan servicer to provide a loan modification, the Robinsons' claim that they suffered damages because they did not receive a loan modification is not cognizable under the statute. *See* 12 C.F.R. § 1024.41(a). Although the Robinsons contend that they would have pursued other loss mitigation options in the absence of the RESPA violations, they have not identified any such options in a way that would permit a calculation of damages associated with any lost opportunity. Where the PaCE consulting fee was a one-time fee to advise the Robinsons in their interactions with Nationstar paid in August 2013, several months before they first submitted the March 2014 loan modification application, this cost was incurred "whether or not [Nationstar] complied with its obligations." *Baez*, 709 F. App'x at 983. Likewise, although Mrs. Robinson expended time corresponding with Nationstar, she was not working for pay at the same time, and the Robinsons have not provided evidence to quantify the loss to Mr. Robinson, the only viable plaintiff here. While Mrs. Robinson stated that she was conducting bookkeeping for Green Earth Services during the relevant time frame, she testified that her work was less than six hours

per week, and the Robinsons have not shown that her time spent communicating with Nationstar "resulted in actual pecuniary loss" to Mr. Robinson or the business. *McLean I*, 595 F. Supp. 2d at 1366.

In contrast, the Court finds that there is a genuine issue of material fact whether the administrative costs and fees incurred by the Robinsons resulted from Nationstar's RESPA violations. Although the parties have not offered specific details on the nature and timing of those costs and fees, it is reasonable to infer that at least some portion of them were incurred after they submitted their March 7, 2014 loan modification application and after Nationstar had violated Regulation X. For example, it was undisputed that on May 30, 2014, Mr. Robinson, in response to Nationstar's requests for additional information, resubmitted the same information sent with his March 2014 loan modification application. Similarly, though the precise nature of the fees imposed was not specified, it is reasonable to infer that some were attributable to delays linked to RESPA violations. Finally, while Nationstar presented arguments for why the Robinsons have not shown damages as to most of the asserted categories, it did not advance any argument for why the interest damages claimed by the Robinsons were not attributable to Nationstar's Regulation X violations and thus is not entitled to summary judgment on that issue. Because there are, at a minimum, disputed issues of fact as to what fees, administrative costs, and interest constitute damages, the Court will deny the motion for summary judgment on the issue of actual damages. Where the Robinsons may be able to show that they have suffered actual damages, their claim for statutory damages, upon a showing that Nationstar has engaged in a pattern or practice of violating Regulation X, remains viable. *See Wirtz*, 886 F.3d at 719–20.

## C.    MCPA

Nationstar also seeks summary judgment on the Robinsons' claims under the MCPA, which include claims of misleading statements in connection with the collection of consumer debts, in violation of section 13-301(1), (3) and section 13-303(4)-(5) of the MCPA, and claims that Nationstar did not respond to consumer inquiries within 15 days, in violation of section 13-316(c) of the MCPA. The Court will address the varying claims in turn.

### 1.    Sections 13–301 and 13–303

The MCPA prohibits the use of an "unfair or deceptive trade practice" in the "[t]he extension of consumer credit" or "[t]he collection of consumer debts" and provides for a private right of action. Md. Code Ann., Com. Law §§ 13–303(4)–(5), 13–408. To establish an MCPA violation under this provision, a plaintiff must establish that (1) the defendant engaged in an unfair or deceptive practice or misrepresentation; (2) the plaintiff relied upon the representation; and (3) doing so caused the plaintiff actual injury. *Stewart v. Bierman*, 859 F. Supp. 2d 754, 768-69 (D. Md. 2012) (citing *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 277 (Md. 2007)), *aff'd sub nom. Lembach v. Bierman*, 528 F. App'x 297 (4th Cir. 2013). An "unfair or deceptive" trade practice includes a "false . . . or misleading oral or written statement . . . or other representation . . . which has the capacity, tendency, or effect of deceiving or misleading consumers." Md. Code Ann., Com. Law § 13–301(1).

In the Amended Complaint, the Robinsons claim that Nationstar's representations that it offered many loss mitigation plans and "would evaluate" borrowers "for eligibility for all these loss mitigation plans" were false. Am. Compl. ¶ 120. Nationstar correctly notes that the Robinsons have not identified a false or misleading statement or representation by Nationstar in the record. Furthermore, to the extent that the Robinsons' claim is that Nationstar falsely stated

that it would evaluate the Robinsons for all available loss mitigation plans, the Robinsons point only to statements in letters that the Robinsons "may" be eligible for certain non-HAMP loan modification programs. *See, e.g.* MSJ JR 0284. Where such statements in no way promise approval, the Robinsons appear to claim that such statements are false or misleading because Nationstar never intended to, and did not, evaluate the Robinsons for the various loss mitigation options. The Robinsons, however, have not identified any evidence that Nationstar did not intend to, and did not, conduct such evaluations. Instead, the Robinsons assert that Nationstar has not affirmatively proven that it conducted such reviews. This assertion mischaracterizes the burden of proof in a civil case. It is the plaintiffs who bear the burden of proving their claims. At this stage of the proceedings, the Court must rely on facts in the record, and not assertions in the pleadings. *Bouchat*, 346 F.3d at 522. Where the Robinsons, after discovery, cannot point to evidence that Nationstar did not even consider or evaluate the Robinsons for loss mitigation options, they have not established the existence of a genuine issue of material fact on the issue of false or misleading statements. Accordingly, Nationstar's Motion for Summary Judgment will be granted as to the MCPA claims under sections 13–301 and 13–303.

### 2. Section 13–316

Section 13–316(c) governs "mortgage servicing" and, among other requirements, provides that a "servicer shall designate a contact to whom mortgagors may direct complaints and inquiries" and that the "contact shall respond in writing to each written complaint or inquiry within 15 days if requested." Md. Code Ann., Com. Law § 13–316(c). The servicer "is liable for any economic damages caused by the violation." *Id.* § 13–316(e)(1).

Nationstar argues that summary judgment should be entered on the Robinsons' MCPA claim under section 13–316 because the Robinsons have not shown that they submitted a complaint

or inquiry that triggers a duty to respond. This Court previously held that a loan modification application can be an inquiry under the MCPA that triggers a duty to respond, and that in the case of the Robinsons, the loan modification application that was "submitted at the request of Nationstar[] necessarily seeks a response." *Robinson*, 2015 WL 4994491, at \*4 (citing *Marchese v. JPMorgan Chase Bank, N.A.*, 917 F. Supp. 2d 452, 467 (D. Md. 2013)). The Court will not revisit this determination.

Nationstar further argues that the Robinsons cannot show that they suffered economic damages as a result of the violation of section 13–316. Although section 13–316 provides a remedy only for economic damages arising from a mortgage servicer's failure to respond to an inquiry, *see* Md. Code Ann., Com. Law § 13–316(e), for the reasons stated above, *see supra* part I.B.4, the Robinsons have provided sufficient evidence to create a genuine issue of material fact whether they have suffered economic damages, in the form of administrative costs, fees, and interest. *Cf. Marchese v. JPMorgan Chase Bank, N.A.*, 917 F. Supp. 2d 452, 468 (D. Md. 2013) (holding that the plaintiff sufficiently pleaded actual injury or loss under the MCPA where he alleged that he suffered "bogus late fees," damage to his credit, and attorney's fees); *see also Cole v. Fed'l Nat'l Mortg. Ass'n*, No. 15-3960, 2017 WL 623465, at \*8 (D. Md. Feb. 14, 2017) (holding that the plaintiff sufficiently pleaded damages under the MCPA where she alleged that the defendant's failures to respond "resulted in the continual assessment of accruing interest, fees and costs on the mortgage account," as well as "stress, physical sickness, headaches, sleep deprivation, worry, and pecuniary expenses"). Nationstar's Motion will be denied as to this claim.

## II.     Motion to Strike

In its Motion to Strike, Nationstar moves to strike the report of the Robinsons' expert witness, Geoffrey Oliver, on the grounds that (1) Oliver was hired pursuant to an ethically

improper contingency fee agreement; and (2) his testimony does not meet the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

### A.    Contingency Fee Arrangement

During discovery, Oliver revealed that his fee arrangement with the Robinsons includes a flat fee for his expert services, but that a portion of the fee is contingent on the certification of a class in this case. Nationstar asserts that Oliver's testimony should be stricken because this fee arrangement includes an unethical contingency fee. *See Farmer v. Ramsay*, 159 F. Supp. 2d 873, 883 (D. Md. 2001) (striking expert testimony because of a contingent fee arrangement), *aff'd*, 43 F. App'x 547 (4th Cir. 2002) (affirming without addressing the propriety of the striking of the expert testimony). In support of this argument, Nationstar contends that the ethical rules for attorneys prohibit contingency fee arrangements with expert witnesses. The Court does not find such a prohibition in the Maryland Attorneys' Rules of Professional Conduct. The relevant rule prohibits an attorney from "offer[ing] an inducement to a witness that is prohibited by law." Md. Rules § 19–303.4(b) (2018). The comments to that rule state that the "common law rule in most jurisdictions is . . . that it is improper to pay an expert witness a contingent fee." *Id.* § 19–303.4 cmt.3. Neither the rule nor the comment, however, state whether Maryland is one such jurisdiction. Indeed, since previous versions of the Maryland rule expressly stated that contingency fee arrangements for experts were forbidden, but that explicit language was removed, it is reasonable to conclude that the amendment changed the rule in Maryland to no longer bar contingency fee arrangements. *See* Md. Rules Prof'l Conduct 3.4 cmt. (2000) (reflecting that the prior version of the rules of professional conduct prohibited an attorney from "acquiesc[ing] in the payment of compensation to a witness contingent on the content of his testimony or the outcome of the case").

Where a contingency fee arrangement for expert witnesses is not expressly prohibited by the Maryland Rules of Professional Conduct, the Court declines to find that the fee arrangement here constituted an ethical violation.

Moreover, even if the fee arrangement violated the ethical rules for attorneys, "it does not follow that evidence obtained in violation of the rule is inadmissible." *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1042 (7th Cir. 1988) (distinguishing between a rule of professional conduct and admissibility of evidence); *cf. Universal Athletic Sales Co. v. Am. Gym, Recreational & Athletic Equip. Corp.*, 546 F.2d 530, 538–39 (3d Cir. 1976) (holding that while it may be unethical for a lawyer to testify on behalf of a client as an expert, "it does not necessarily follow that any alleged professional misconduct" would require exclusion of the testimony because the rules of professional conduct do "not delineate rules of evidence"); *United States v. Fogel*, 901 F.2d 23, 26 (4th Cir. 1990) (citing *Universal Athletic* favorably for this proposition). The Federal Rules of Evidence do not prohibit these kinds of arrangements. *See* Fed. R. Evid. 702, 703. Rather than rendering the testimony inadmissible, the fee arrangement is relevant to the expert's credibility. *Tagatz*, 861 F.2d at 1042; *cf. United States v. Valona*, 834 F.2d 1334, 1344 (7th Cir. 1987) (holding, in the context of an informant who is paid a contingent fee, that the fee should be treated "as a credibility factor").

Nationstar's reliance on *Accrued Financial Services v. Prime Retail, Inc.*, 298 F.3d 291 (4th Cir. 2002), is misplaced. In *Accrued Financial*, the United States Court of Appeals for the Fourth Circuit held that where commercial real estate tenants assigned their potential claims against their landlords to a commercial real estate auditor under an arrangement through which the auditor would receive a percentage of any recovery in litigation, the assignments violated public policy because where the auditor's employees could testify in such litigation, the assignments

"provide for supplying *expert* testimony for a contingent fee." *Id.* at 300. The public policy interest at issue was one against "stirring up litigation or promoting litigating for the benefit of the promoter rather than for the benefit of the litigant or the public," an interest not implicated in the same manner by the fee arrangement with the particular expert witness in this case. *Id.* at 300. Moreover, although the court stated that an arrangement for providing expert testimony for a contingent fee would violate public policy, the court did not address the question of the admissibility of evidence at issue here. *See id.*

Where *Accrued Financial* addresses a different scenario with a different remedy, the Court does not find that it requires that the testimony of an expert witness paid on contingency fee basis must be excluded. Rather, the Court finds, based on the reasoning of *Tagatz* and *Universal Athletic Sales*, that the potential violation of an ethical rule does not itself make Oliver's testimony inadmissible. *See Tagatz*, 861 F.2d at 1042. The fee arrangement will be considered as an issue potentially affecting the credibility, rather than the admissibility, of the expert testimony. *See id.*

**B.    *Daubert***

Nationstar also argues that Oliver's report should be stricken as unreliable under the Federal Rules of Evidence and *Daubert*. Rule 702 permits an expert to testify if the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," "is based on sufficient facts or data," and "is the product of reliable principles and methods," and if the expert has "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. When considering whether expert testimony is reliable or should be excluded, the court considers the following factors:

> (1) [W]hether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its

operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 480 (4th Cir. 2018) (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)). The inquiry is meant to be "flexible" and the factors "helpful, not definitive." *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–51 (1999)). The court's analysis should focus "on the 'principles and methodology' employed by the expert, not on the conclusions reached," *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (quoting *Daubert*, 509 U.S. at 594–95), and "whether the reasoning or methodology" is "scientifically valid" and "properly can be applied to the facts in issue," *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (quoting *Daubert*, 509 U.S. at 592–93).

"When an expert's report or testimony is 'critical to class certification,'" the district court "must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012). An expert's testimony is "critical" where it is "important to an issue decisive for the motion for class certification." *Id.* Since neither party contends that Oliver's testimony and report are not "critical," the Court must address the *Daubert* challenge before reaching the question of class certification.

Oliver's expert report focuses on the use of Nationstar's internal databases to determine whether Nationstar has systematically failed to comply with various requirements of Regulation X. For the requirements that hinge on the timing of a communication or response, Oliver's methodology consists of using Nationstar's data from the LSAMS and FileNet software applications relating to a sample of 400 loans to identify the dates when certain events occurred—such as the filing of a loan modification application, when a loan modification application became

complete, and the sending of an acknowledgment or decision letter to a borrower—and then counting the days between the dates to assess whether a RESPA timing requirement was satisfied. From this approach, Oliver concluded that for approximately 60 percent of the sampled loans, Nationstar failed to comply with the requirement that it inform the borrower of loss mitigation application determination within 30 days of receiving a complete application. Likewise, he concluded that for approximately 53 percent of sampled loans, Nationstar failed to comply with the requirement of acknowledging receipt of the application within five days.

For the Regulation X provisions that require the servicer to communicate specific information to a borrower, Oliver's methodology involves reviewing a sample of loan files and identifying a specific communication to a borrower based on the file name. Because Nationstar employees used standard templates to communicate with borrowers, Oliver concluded that Regulation X violations can be identified through the existence of noncompliant templates and the dates that those templates were in use. From this methodology, Oliver concluded that Nationstar failed to inform borrowers of their appeal rights in 39 percent of the sampled loans and failed to exercise reasonable diligence by improperly requested the same documentation already provided in 18 percent of the loans. To calculate damages, Oliver stated that he would look to data from the LSAMS application, including data tables that contain fee information, to identify fees that would not have been charged but for Nationstar's various RESPA violations, but that he was not able to evaluate this data in his report because it had not been provided to him. Thus, based on his report and experience, Oliver concludes that Nationstar "failed to comply" with Regulation X and that it is possible to "identify violations" of Regulation X "using the methodologies" he described, without the necessity of a file-by-file review. MCC JR 0003.

In its Motion to Strike, Nationstar argues that Oliver's methodology has not been peer reviewed, has a high error rate because he used the wrong data fields to identify the dates of events, failed to consider the timing of foreclosure sales relative to the dates of the submission of loan modification applications, and did not propose a specific methodology for calculating damages. The fact that Oliver's methodology has not been subjected to peer review and that he has not published any articles about it does not invalidate it. As the Supreme Court noted in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), *Daubert* "made clear that its list of factors was meant to be helpful, not definitive," and it is not always the case that an expert witness's claim will have been subjected to peer review. *Id.* at 151. "[A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 152. Because Oliver analyzed proprietary databases and data specifically disclosed for this litigation pursuant to a protective order, such that Oliver's peers lack access to the same information, Oliver's expert testimony is not of the type that ordinarily would be subject to peer review, and it would be unfair to require "general acceptance within a relevant scientific community." *Hickerson*, 882 F.3d at 480 (quoting *Cooper*, 259 F.3d at 199).

As for the claims of errors in Oliver's analysis, although this criticism is couched as his "misunderstanding the nature of Nationstar's various databases," Nationstar largely challenges Oliver's failure to use particular data fields, some which were never made available to him. It does not mount any persuasive attack on Oliver's "principles and methodology," *Westberry*, 178 F.3d at 261, which largely consisted of counting the number of days between events and reviewing files for a particular loan to determine whether they contained certain standard content. Nationstar's criticism that Oliver failed to use the correct data field to identify the date when a loss mitigation application was complete, and failed to consider the timing of application relative to

the date of scheduled foreclosure sale, ring hollow because Nationstar provided to Oliver only limited data fields, which did not contain clear field names or definitions. The data derived from scripts written by another expert, Abraham J. Wyner, without the benefit of seeing the databases, a process necessitated by Nationstar's unwillingness or inability to produce the relevant data. Notably, Oliver's analysis did not consider foreclosure information because the data produced did not include dates of foreclosure sales. Where it is now apparent, in hindsight, that Nationstar was permitted to withhold relevant and necessary data in the discovery process, it is unsurprising that Nationstar employees would then review loan files, with their complete data, and identify problems. But where the broad methodology is sound, the lack of consideration of unproduced data cannot provide a basis to strike the expert witness's testimony. Rather than striking the testimony, the Court may need to consider permitting supplemental discovery to correct for the lack of relevant data not previously made available to Oliver.

Finally, to the extent that Oliver did not execute his stated methodology for identifying damages, that limitation is again based in part on Nationstar's failure to make relevant data available to him. Particularly where a class may be certified even if individualized damages calculations would be necessary, the incomplete nature of the damages analysis does not provide a basis for striking Oliver's expert testimony. *See Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defense peculiar to some individual class members.'" (quoting 7AA Charles Allan Wright et al., Federal Practice and Procedure § 1778 (3d ed. 2005))). Because Oliver's methodology is reliable

within the meaning of Federal Rule of Civil Procedure 702 and *Daubert*, Nationstar's Motion to Strike will be denied.

### III. Motion for Class Certification

In their Motion for Class Certification, the Robinsons seek certification of two classes. The "Nationwide Class" is composed of "[a]ll persons in the United States that submitted a loss mitigation application to Nationstar after January 10, 2014, and through the date of the Court's certification order." Mot. Class Cert. ("MCC") 2, ECF No. 218. The "Maryland Subclass" consists of "[a]ll persons in the State of Maryland that submitted a loss mitigation application to Nationstar after January 10, 2014, and through the date of the Court's certification order." *Id.* Since the parties do not argue that the Nationwide Class and the Maryland Subclass differ for the purposes of the class certification analysis, the Court will analyze them together.

First, as a threshold matter, the Court notes that in ruling on Nationstar's Motion for Summary Judgment, it will grant judgment in favor of Nationstar as to Mrs. Robinson's claims, Mr. Robinson's RESPA claims under 12 C.F.R. § 1024.41(f), (g), and (h), and Mr. Robinson's MCPA claim under sections 13–301 and 13–303. *See supra* parts I.B.1, I.B.3, I.C.1. "[N]amed class representatives [must] demonstrate standing through a 'requisite case or controversy between themselves personally and defendants,' not merely allege that 'injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 188 (4th Cir. 1993) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1001 n.13 (1982)). Since Mrs. Robinson may not bring a claim under Regulation X, she may not be a named class representative. Similarly, since Mr. Robinson has not suffered injury under these provisions, he may not bring those claims on behalf of the class. *See Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1023 (9th Cir. 2003) ("[I]f Lierboe has

no stacking claim, she cannot represent others who may have such a claim, and her bid to serve as a class representative must fail."); *cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011) ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977))).

## A. Legal Standard

A class action allows representative parties to prosecute not only their own claims, but also the claims of other individuals which present similar issues. *Thorn v. Jefferson-Pilot Life Ins. Co*, 445 F.3d 311, 318 (4th Cir. 2006). The use of a class action is primarily justified on the grounds of efficiency, because it advances judicial economy to resolve common issues affecting all class members in a single action. *Id.* Because of the need to protect the rights of absent plaintiffs to assert different claims and of defendants to assert facts and defenses specific to individual class members, courts must conduct a "rigorous analysis" of whether a proposed class action meets the requirements of Federal Rule of Civil Procedure 23 before certifying a class. *See id.* Courts have wide discretion to certify a class based on their familiarity with the issues and potential difficulties arising in class action litigation. *See, e.g., Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010). A plaintiff has the burden to show that all of the necessary prerequisites for a class action have been met. *Gunnells v. Healthplan Serv., Inc.*, 348 F.3d 417, 458 (4th Cir. 2003).

The first of these prerequisites is that the class must exist and be "readily identifiable" or "ascertainable" by the court through "objective criteria." *EQT Prod. Co v. Adair*, 764 F.3d 347, 359–60 (4th Cir. 2014). While it is not necessary to identify every class member at the time of certification for a class to be "ascertainable," a class cannot be certified if its membership must be determined through "individualized fact-finding or mini-trials." *Id.* at 358. For example, in *EQT*,

the court concluded that a proposed class of all individuals who owned an interest in a gas estate was not ascertainable because the actual owners could be determined only through an individualized review of land records. *Id.* at 359–60.

If a class is ascertainable, it must then satisfy all four elements of Rule 23(a): numerosity, commonality, typicality, and adequacy. To satisfy the numerosity requirement, the proposed class must be so numerous that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In assessing this element, "numbers alone are not controlling" and a district court should consider "all of the circumstances of the case." *Ballard v. Blue Shield of S.W. Va., Inc.*, 543 F.2d 1075, 1080 (4th Cir. 1976). The Fourth Circuit has stated that 74 members is "well within the range appropriate for class certification," *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984), and has upheld the certification of a class with as few as 18 members, *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967). However, the burden is on the plaintiffs to show that other class members exist and that their joinder is impracticable; a court may not rely on mere speculation that numerosity has been satisfied. *See Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 356–57 (3d Cir. 2013); *Poindexter v. Teubert*, 462 F.2d 1096, 1097 (4th Cir. 1972).

Commonality requires that a class have "questions of law or fact common to the class" which are capable of classwide resolution, such that the determination of the truth or falsity of the common issue "will resolve an issue that is central to the validity of each one of the claims in one stroke." Fed. R. Civ. P. 23(a)(2); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

As for typicality, the named plaintiff must be "typical" of the class, such that that the class representative's claim and defenses are "typical of the claims or defenses of the class" in that prosecution of the claim will "simultaneously tend to advance the interests of the absent class

members." Fed. R. Civ. P. 23(a)(3); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466–67 (4th Cir. 2006). The plaintiff's claim "cannot be so different from the claims of absent class members that their claims will not be advanced by" proof of the plaintiff's own individual claim. *Deiter*, 436 F.3d at 466–67. In analyzing this question, a court compares the class representative's claims and defenses to those of the absent class members, considers the facts needed to prove the class representative's claims, and assesses the extent to which those facts would also prove the claims of the absent class members. *Id.* These claims do not have to be factually or legally identical, but the class claims should be fairly encompassed by those of the named plaintiffs. *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 344 (4th Cir. 1998).

Finally, the named plaintiff must "fairly and adequately protect the interests of class" without a conflict of interest with the absent class members. Fed. R. Civ. P. 23(a)(4); *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 179–80 (4th Cir. 2010). A conflict of interest will not defeat the adequacy requirement when "all class members share common objectives[,] the same factual and legal positions, and . . . the same interest in establishing the liability of defendants." *Ward*, 595 F.3d at 180 (quoting *Gunnells*, 348 F.3d at 430). Moreover, the conflict must not be "merely speculative or hypothetical." *Id.*

If the named plaintiff satisfies each of these requirements under Rule 23(a), the Court must still find that the proposed class action fits into one of the categories of class action under Rule 23(b) in order to certify the class. A class action may be maintained under Rule 23(b)(3) if common questions of law or fact "predominate over any questions affecting only individual members" and a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Factors "pertinent" to the predominance and superiority requirements include the "class members' interests in individually controlling" the

litigation, whether litigation on the matter has already been begun by other class members, whether concentrating the litigation in one forum is desirable or undesirable, and the potential difficulties managing the class action presents. *Id.* Although similar to Rule 23(a)'s commonality requirement, the test for predominance under Rule 23(b)(3) is "far more demanding" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623–24 (1997). The predominance and superiority requirements under Rule 23(b)(3) are designed to ensure that the class action "achieve[s] economies of time, effort, and expense, and promote[s] . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Gunnells*, 348 F.3d at 424 (quoting *Amchem*, 521 U.S. at 615). If the named plaintiff satisfies all of the Rule 23(a) requirements and the Rule 23(b)(3) requirements, then class certification is appropriate.

Finally, the Court notes that a decision to certify a class is based on whether or not a putative class satisfies the Rule 23 factors, not on a preliminary assessment of the underlying merits of the claim. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.").

## B.     12 C.F.R. § 1024.41(c)(1)(i) and (d)

First, Nationstar correctly notes that Mr. Robinson, in his Motion, and Oliver, in his expert report, do not put forward any evidence establishing that the necessary prerequisites for a class action have been met with respect to the claim that Nationstar did not evaluate borrowers "for all loss mitigation options available to the borrower," in violation of 12 C.F.R. § 1024.41(c)(1)(i). Since it is the plaintiff's burden to establish that the requirements of Rule 23 have been met and

Mr. Robinson has failed to do so, the Motion for Class Certification will be denied as to any claims that Nationstar violated 12 C.F.R. § 1024.41(c)(1)(i).

Likewise, Oliver's expert report provides no analysis on how Nationstar's databases allow for a systematic determination whether Nationstar failed to inform borrowers of the specific reasons for the servicer's decision to deny each loan modification option, in violation of 12 C.F.R. § 1024.41(d). Accordingly, the Motion is denied as to such claims.

### C.    Rule 23(a)

The Nationwide Class and the Maryland Subclass are ascertainable and satisfy the Rule 23(a) factors. For purposes of ascertainability, the requirements of 12 C.F.R. § 1024.41(b)(2)(i)(B) and Md. Code Ann., Com. Law § 13–316(c) are triggered upon the submission of a loss mitigation application, while 12 C.F.R. § 1024.41(c) and (d) impose obligations on a loan servicer once it receives a "complete loss mitigation application" and once the completed application is denied. Potentially eligible class members for all of these provisions can be identified through the LSAMS and Remedy data that marks that an application was received, identified as complete, and denied. *See* MCC JR0529–31. Because such information is stored electronically and based on objective criteria, the members of the class will be ascertainable without significant administrative burden. *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (noting that the purpose of certifying a class "is not to identify every class member at the time of certification, but to define a class in such a way as to ensure that there will be some administratively feasible [way] for the court to determine whether a particular individual is a member at some point" (internal citation omitted) (quoting *EQT Production Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014))). Moreover, the possibility that some members of the class as defined by the Robinsons have not suffered any injury cognizable under RESPA or MCPA does not preclude certifying the class. *See Torres v.*

*Mercer Canyons Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016) ("[F]ortuitous non-injury to a subset of class members does not necessarily defeat certification of the entire class, particularly as the district court is well situated to winnow out those non-injured members at the damages phase of the litigation, or to refine the class definition."); *see also* 1 William Rubenstein et al., Newberg on Class Actions § 2:3 (5th ed. 2011) ("[T]he possibility that a well-defined class will nonetheless encompass some class members who have suffered no injury . . . is generally unproblematic as the non-injured parties can just be sorted out at the remedies phase of the suit."). Nationstar also does not argue that the class is not numerous, as there approximately 33,855 members who submitted loss mitigation applications from January 10, 2014 to March 30, 2014. And given that the class includes all borrowers who have submitted an application since January 10, 2014, joinder of all members is eminently impractical.

The commonality requirement is also met. Nationstar admits that in March 2014, two months after the implementation date of Regulation X, it had not yet updated its systems to comply with the regulation. As a result, the Robinsons' claim that Nationstar violated certain Regulation X procedures with respect to their loan modification application and those of the class members. While the date that Nationstar's systems came into compliance is unknown, Nationstar's systematic noncompliance presents common questions of law and fact for all class members. Moreover, whether Nationstar engaged in a "pattern or practice" of Regulation X violations, within the meaning of 12 U.S.C. 2605(f), is common question of law and fact that Mr. Robinson and the class members would all be required prove in their individual cases in order to qualify for statutory damages. *See Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 56–57 (3d Cir. 1994) (noting that a single common issue is sufficient to meet the commonality requirement). That claim will be subject to common proof, namely sampling and analysis of loan files along the lines suggested

by Oliver. *See Tyson Foods*, 136 S. Ct. at 1046–47 (holding that representative sampling was a permissible method to prove whether time spent donning and doffing gear resulted in violations of the Fair Labor Standards Act). Indeed, Nationstar does not seriously contest the commonality prong.

Since the Court has already concluded that Nationstar is entitled to summary judgment on the Robinsons' claims under 12 C.F.R. § 1024.41(f), (g), and (h), and Md. Code Ann., Com. Law §§ 13–301 and 13–303, and that Mr. Robinson therefore may not assert such claims on behalf of the class, Mr. Robinson's remaining claims and defenses are typical of the class members. *See McGraw*, 646 F.2d at 176. Like the class members, to prove his case, Mr. Robinson will have to show that Nationstar failed to timely and appropriately respond to his loan modification applications by pointing to the dates of his submissions and the dates and contents of Nationstar's responses. While the particulars of Mr. Robinson's application process will not necessarily prove that Nationstar mishandled the applications of other individual class members, these facts fairly encompass the types of claims that would be brought by the members of the class. *See Broussard*, 155 F.3d at 344. Although each class member must individually show that they suffered "actual damages" under 12 U.S.C. 2605(f)(2), "Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification." *Gunnells*, 348 F.3d at 427–28. Furthermore, Nationstar's argument that the Robinsons are not typical largely recycles the same arguments made in the Motion for Summary Judgment. "[A]n evaluation of the merits to determine the strength of plaintiffs' case is not part of a Rule 23 analysis." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004). Since the Court already considered and ruled on these issues, *see supra* part I.B, it will not revisit those arguments here.

Finally, the Court finds that Mr. Robinson will adequately represent the absent class members. Mr. Robinson's counsel is experienced in complex civil litigation and class action litigation. Although Nationstar argues that Mr. Robinson has a conflict of interest because he wishes to avoid foreclosure and to delay payments on his mortgage, the record does not reflect that proposition. While Mr. Robinson sought to reduce his monthly mortgage payment in applying for a loan modification, his deposition testimony reflects that he understands that the present lawsuit contends that Nationstar did not process the Robinsons' loan modification application correctly. Since Mr. Robinson has the same goal as the other class members of establishing that Nationstar violated Regulation X with respect to his loan, he will adequately protect their interests.

### D.    Rule 23(b)(3)

Since the Rule 23(a) factors are satisfied, the Court will now consider whether the Rule 23(b)(3) predominance and superiority considerations are met. A class action is a superior means for "fairly and efficiently adjudicating" whether Nationstar has violated Regulation X and section 3–316(c) of the MCPA. Fed. R. Civ. P. 23(b)(3). The Robinsons assert, and Nationstar does not argue otherwise, that litigation regarding Regulation X is not proceeding against Nationstar in another forum. There is no reason to conclude that individual class members have any particular interest in individually controlling the litigation through separate actions, or that this Court is an undesirable forum to host this litigation, since Nationstar services loans in this district, is subject to jurisdiction here, and has presented no argument that Maryland is an inconvenient forum. Class litigation would also promote consistent results on the common question whether Nationstar engaged in a pattern or practice of violating Regulation X and would provide Nationstar with finality and closure on that issue. *See Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 275 (4th

Cir. 2010) (considering consistency of results that provide finality to the defendant as favoring a finding of superiority).

Since the MCPA and Regulation X allow recovery only of "economic damages," Md. Code Ann., Com. Law § 13–316(e)(1), and "actual damages," 12 U.S.C. § 2605(f), caused by the violation, which likely consist of administrative fees and costs, the individual recovery available for each class member would likely be low, far below the cost of litigating the claims themselves. Individual damages would be below the cost of litigation even if each class member could establish that Nationstar's conduct consisted of a pattern or practice of violating Regulation X, because the statute limits such damages to $2,000 per borrower. 12 U.S.C. § 2605(f)(1). Where the cost of litigation as compared to the potential recovery gives class members little incentive to bring suit, and there is little reason to individually control the litigation, a class action is a superior method to vindicate the rights of class members. *See Stillmock*, 385 F. App'x at 274 ("[T]here is no reasoned basis to conclude that the fact that an individual plaintiff can recover attorney's fees in addition to statutory damages of up to $1,000 will result in enforcement of [the Fair Credit Reporting Act] by individual actions of a scale comparable to the potential enforcement by way of class action.").

Finally, the Court finds that common issues of law and fact predominate. In focusing on whether RESPA violations can be established through computerized analysis rather than individual file review, the parties lose track of the fact that because statutory damages are predicated on a finding that there has been a pattern or practice of RESPA violations, that issue common to almost any individual claim plays an outsized role in the predominance analysis. First, to the extent that there was a period of time during which Nationstar failed to implement procedures to comply with RESPA, the facts establishing such a gap would be highly relevant to a pattern or practice determination and would be common in every case. More importantly, while a determination of

an individual violation would not require extensive analysis, specific proof of a pattern or practice of RESPA violations in any individual case would be a substantial undertaking, likely requiring the same type of complex analysis proposed here: a sampling of Nationstar files, compilation of all relevant data for such files, expert analysis to identify violations, and an assessment whether the identified violations are sufficient to establish a pattern or practice of violations. Where the results of such an analysis would apply to any individual claim, it would be highly inefficient and wasteful to require duplicative analysis in each such case. To the extent that, as Nationstar claims, such a determination could not be fully accomplished through computerized analysis alone, the resources needed to resolve this question would be even greater, such that the importance of having it resolved in a common fashion for all claims would be heightened. Thus, the nature of the proof of whether there has been a pattern or practice of RESPA violations provides substantial support for a finding of predominance.

Furthermore, the Robinsons have made a sufficient showing that a central computerized analysis of Nationstar data would substantially, if not completely, resolve questions of whether RESPA violations occurred. Although based on imperfect data, Oliver's expert report reveals that such analysis can substantially address whether Nationstar violated 12 C.F.R. § 1024.41(b)(2)(B), which requires that an acknowledgment letter be sent within five days of receipt of a loan modification application; or 12 C.F.R. § 1024.41(c)(1)(ii), which requires a servicer to respond to a completed loan modification application; or Md. Code Ann., Com. Law § 13–316(c), which requires a response to a loan modification application within 15 days. Proof of these claims requires a showing of the dates that an application was received, an acknowledgment letter was sent, an application became complete, Nationstar sent a decision letter to the borrower, and a foreclosure sale is scheduled. *See* 12 C.F.R. § 1024.41(b)(2)(B), (c)(1)(ii); Md. Code Ann., Com.

Law § 13–316(c). These events will be represented by discrete data points in Nationstar's databases, such that these violations may be proved through that data.

For example, Nationstar's own internal procedures reveal that when a loss mitigation application is received, a processor reviews it to determine if all required information and documents have been received, and enters one code, specifically "code HMPC" in LSAMS signifying "Financial Application Complete," and a different code, specifically "code HMPA," signifying "Financial Application Incomplete." MCC JR 318, 530-531. Although this data was not provided to Oliver, there is no reason it could not be produced and used to make determinations on the timeliness of decisions on loss mitigation applications. Likewise, the articulated concern that Nationstar would not be required to respond to loss mitigation applications filed within a certain number of days of a foreclosure sale, can be addressed through the provision of data relating to the dates of scheduled foreclosure sales.

Nationstar's claim that the above-described coding is not dispositive, because an underwriter could subsequently determine that more information was needed after all, is not persuasive. This argument runs contrary to the plain language of Nationstar's own procedures, which describe the application as "complete" based on the processor's determination, leading to the referral of the complete package to an underwriter. MCC JR 530. Moreover, Nationstar cites no authority for the proposition that a loss mitigation application would not be deemed "complete" for purposes of RESPA upon such a formal designation, and any rule that would deem such an application incomplete in the event that an underwriter subsequently decided to ask for additional material would be entirely unworkable. Thus, the Court concludes that common computerized analysis can largely answer the question of whether Nationstar violated these RESPA provisions with respect to individual borrowers.

At a minimum, the question of when a loss mitigation application is "complete" under RESPA within the workflow of Nationstar—whether at the time of the processor's designation of the file as complete or at a later stage—is a significant unresolved question of law and fact that would be common to all RESPA claims against Nationstar. Because such a common question would have to be resolved in many if not all individual cases, it advances, rather than undermines, the argument in favor of predominance.

Finally, where Nationstar has offered no specific argument in its brief, beyond those addressed above, to refute Oliver's proffered analysis for identifying RESPA violations arising from the failure to notify borrowers of their appeal rights or the failure to exercise diligence in requesting documents based on repeated requests for the same documents, 12 C.F.R. §§ 1024.41(c)(1)(ii), 1024.41(b)(1), the Court concludes that common computerized analysis will substantially advance the resolution of such claims, even if not entirely eliminating the need for reviewing certain specific file documents. Thus, the Court concludes that, while Nationstar may have defenses as to some borrowers, the common proof that establishes the asserted violations, as well as the common question of whether the Robinsons can prove a pattern-or-practice violation by Nationstar, will predominate over the individual issues as to these claims.

The fact that each borrower must individually show damages under 12 U.S.C. § 2605(f)(2) is not fatal to the predominance inquiry. *Gunnells*, 348 F.3d at 429 ("[T]he need for individualized proof of damages alone will *not* defeat class certification."). While every class member will have to establish damages, that calculation will not be "particularly complex," as it will require identifying administrative costs and fees that would not have occurred but for the RESPA violation. *Id.* Furthermore, determining whether statutory damages are available will require no individualized consideration, because the pattern-or-practice claim "would be based solely on"

Nationstar's conduct and can be established through sampling. *Id.* While class members would not be eligible for statutory damages unless actual damages are shown, *see* 12 U.S.C. § 2605(f)(2); *Wirtz*, 886 F.3d at 719–20, that the individualized damages inquiry would need to precede the award of statutory damages based on a finding of a pattern-or-practice of RESPA violations is a distinction without a difference: whether individual damages are shown before or after the pattern-or-practice liability, the common issues of liability predominate over the individualized questions of damages.

Therefore, the Court will grant in part and deny in part the Motion for Class Certification. Certification will not be granted as to the claims under 12 C.F.R. § 1024.41(f), (g), and (h), and Md. Code Ann., Com. Law §§ 13–301 and 13–303, because the Robinsons do not have standing to bring those claims. Certification will also be denied as to the claim under 12 C.F.R. §§ 1024.41(c)(1)(i) and (d), because the Robinsons made no showing that the Rule 23 requirements were met. Because all of the Rule 23(a) and (b)(3) requirements are met as to a class asserting violations of 12 C.F.R. § 1024.41(b)(1), (b)(2)(i)(B), and (c)(1)(ii) and Md. Code Ann., Com. Law § 13–316(c), the Court will grant class certification as to those class members and claims.

## CONCLUSION

For the foregoing reasons, Nationstar's Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART. The Motion will be granted as to all of Tamara Robinson's claims and as to Demetrius Robinson's claims under 12 C.F.R. § 1024.41(f), (g), and (h) and Md. Code Ann., Com. Law § 13-301 and 303. It will be otherwise denied. Nationstar's Motion to Strike will be DENIED. The Robinsons' Motion for Class Certification will be GRANTED IN PART and DENIED IN PART. Class certification will be granted, with Demetrius Robinson as

the named plaintiff, as to both the Nationwide Class and the Maryland Class for the claims under 12 C.F.R. § 1024.41(b)(2)(i)(B), which requires that an acknowledgment letter be sent within five days of receipt of a loss mitigation application; 12 C.F.R. § 1024.41(c)(1)(ii), which requires a servicer to respond to a loan modification application within 30 days of receipt of a complete loss mitigation application and provide notice of appeal rights; 12 C.F.R. § 1024.41(b)(1), which requires reasonable diligence in obtaining documents and information to complete a loss mitigation application; and Md. Code Ann., Com. Law § 13–316(c), which requires a response to a mortgage servicing complaint or inquiry within 15 days. The Motion will be otherwise denied. A separate Order shall issue.

Date:   September 9, 2019

THEODORE D. CHUANG
United States District Judge